(101 South. 398)

No. 24593.

### RAZER v. BROWN.

(June 28, 1924. Rehearing Denied by Whole Court Sept. 25, 1924.)

*(Syllabus by Editorial Staff.)*

1. Evidence ☞213(1) — Willingness to pay something in recognition of interest of plaintiff in promoting sale held not acknowledgment of right to commission.

Realty vendor's willingness to pay something to one who claimed to have been instrumental in procuring purchaser, in recognition of such person's interest in furthering sale, *held* not an admission of any obligation on his part, nor acknowledgment of right to commission.

2. Brokers ☞86(1)—Evidence held insufficient to show employment of plaintiff, or that he was procuring cause of sale.

Evidence *held* insufficient to establish that plaintiff was employed to negotiate a sale of land, and was the procuring cause of sale effected.

Appeal from Ninth Judicial District Court, Parish of East Carroll; F. X. Ransdell, Judge.

Action by William M. Razer against W. D. Brown. Judgment for plaintiff, and defendant appeals. Judgment set aside, and suit dismissed.

James H. Gilfoil, Jr., of Lake Providence, for appellant.

John B. Stone, of Tallulah, for appellee.

By Division A, composed of O'NIELL, C. J., and ROGERS and BRUNOT, JJ.

ROGERS, J. Defendant appeals from a judgment condemning him in the sum of $19,-

500 for commissions alleged to have been earned by plaintiff in effecting a sale of certain plantations, under an oral contract entered into some time in the month of August, 1919.

Defendant was the owner of Gossippia, Ingleside, and Semple plantations, in the parish of East Carroll. On October 23, 1919, he sold these properties to John M. Countiss. The purchase price was $170,000, represented by cash and notes of the vendee. Plaintiff avers that he was the procuring cause of the sale under oral employment by defendant to secure a purchaser.

There are only two questions in the case, viz: (1) Was plaintiff employed by defendant to negotiate a sale of his plantations? (2) Was petitioner the procuring cause of the sale to Countiss?

The only direct evidence on the point involved in the first question is the testimony of the litigants themselves, plaintiff asserting, and defendant denying, the alleged employment.

Plaintiff, as shown by the record, is not regularly engaged in the business of real estate broker. He has no office other than the sidewalks of the town of Lake Providence. He has no business cards or stationery. He never advertises, and he pays no license. Plaintiff's occupation during the year of 1919 was buying and selling hogs and cattle. He also engaged in several small real estate deals. To use his own words, "Anything to make a dollar" was his creed.

Plaintiff's testimony seeking to establish the alleged oral agreement for services is not impressive. It is vague and uncertain, and consists, largely, of generalities.

In his petition plaintiff alleges that he was employed in the month of August, 1919, "the exact date having escaped petitioner's memory." On direct examination he stated that the agreement was entered into "about the last of July or August," when he "went up"

to defendant's place to buy some hogs. On cross-examination, when pressed for particulars as to the time and place of employment, his testimony was rambling and evasive. At one point he states that the contract was made "not far from the 1st of October, 1919." At another place he fixes the date "in the last part of July." He then speaks of numerous conversations had with defendant, in each of which he asserts the agreement was entered into, and that "the last contract was the same as before." We quote, in part, from the cross-examination of plaintiff:

"Q. What I want to find out, if possible, is on what date, or about what date, you will testify to that Mr. Brown made the contract which you claim he made with you, and which contract is the foundation of this suit which we are now trying?

"A. Well, airy one of them; it is practically the same where he told me all over $100 was mine; he gave me that every time he talked to me; I can't tell which one was the one, I take all.

"Q. At what place was it that this contract which you claim you made with Mr. Brown, and upon which this suit is founded, was made; in other words, where do you claim you and Mr. Brown were when you and Mr. Brown made the contract which you claim you had with him, and upon which this suit is founded?

"A. Between the First National Bank and the corner of Brown's Drug Store.

"Q. You mean on the sidewalk?

"A. No, on the street; nobody there but me and him; he aint got nobody to swear they were there to hear it. * * *

"Q. You mean the main street of Lake Providence?

"A. The main street, or whatever it is."

Defendant denies that he employed plaintiff to sell his upper properties consisting of the Gossippia and Semple plantations. He frankly states that, in so far as the lower place (Ingleside) was concerned, plaintiff came to him and informed him that Dr. Brown (defendant's brother) was trying to buy a small place, and that, if he (plaintiff) could succeed in securing one for him, the doctor had promised to put him (plaintiff) on it; that plaintiff asked defendant if he

would give him something if he sold Ingleside, and that defendant said he would. Defendant further testified that he did not think his brother wanted the place, as farming was not in his line, but he went to see him in regard to the matter and found he was eager to purchase the property. Dr. Brown finally offered defendant $112.50 per acre for the 400 acres contained in the plantation. This offer was declined, defendant informing his brother that he was going to obtain $125 per acre.

In regard to the second question involved, as to whether plaintiff was the procuring cause of the sale to Countiss, the record shows that in January, 1919, John M. Countiss, who was a resident of the state of Arkansas, purchased the Waterloo or Cox plantation, situated in the parish of East Carroll, in this state. During the year 1919, the plantation was jointly operated by the purchaser and one of his relatives, Hope T. Countiss.

In October, 1919, Hope T. Countiss became ill, and John M. Countiss journeyed to the parish of East Carroll to look after his relative. He arrived in the town of Lake Providence on the morning of October 19, 1919, where he met and had breakfast with Robert R. Higgins, a friend of long standing, formerly a resident of Arkansas. After breakfast, Countiss and Higgins repaired to the "Wells Brothers' Livery Stable" for the purpose of obtaining mounts to carry them to their respective places, Countiss to Waterloo plantation, and Higgins to the plantation on which he resided, which was farther down the road leading from the town. A delay of a few minutes occurred at the stable awaiting the saddling of a mule belonging to Higgins, and the saddling of a horse for the use of Countiss. It was during this short interval of time only that plaintiff claims to have negotiated the sale of defendant's properties. Plaintiff had never seen Countiss prior thereto. His version of the incident is that he met Countiss at the livery stable; that Countiss "was a big fine man and looked like a man with money," and plaintiff "butted in to him to see what he was doing there." Plaintiff states that they had a conversation about land, and he talked about the Hill (Ingleside) place and other places, about a fine brick house and pecan grove that was on one of the other places, and about the owner being anxious to sell; that after talking for about a half an hour Countiss stated that he did not care to buy any property, and then finally asked plaintiff if he could get a car and take him up there, which plaintiff agreed to do, appointing 1 o'clock of the same day as the time for starting out on the trip. Plaintiff further testifies that he was ready at the appointed hour, but that Mr. Countiss refused to go then, stating he was going to Transylvania and that he would go to look at the property in the morning. He further states that he became worried and then called up Brown by telephone to advise him that he thought Countiss would call on him and to watch out for him, and to put him (plaintiff) on a good commission, as he had done all he could. He says that defendant agreed to this and requested him to call him up again at 8 o'clock the same night, when he (defendant) would advise him whether the parties came or not; that he did telephone defendant at 8 o'clock and that defendant advised him of the visit of Countiss, but that he did not sell, and asked plaintiff for advice; that he agreed to meet plaintiff next morning in the town, and that he did meet him and they talked over the prospective sale; that the sale was finally consummated, and that he was so advised by defendant, who asked him if he was in a hurry for a settlement, to which he replied he was not; that defendant promised a settlement in a day or two, which he did not make; that after waiting for some time, and after sever-

.al conversations with defendant for the purpose of obtaining payment of his claim, without avail, he instituted the present suit.

Mr. Higgins testified that, while he and Countiss were at the livery stable waiting to have a mule for himself, and a horse for Countiss, "saddled up," the subject came up about some land; that Countiss remarked he would not mind buying another piece of land in Louisiana. The witness then said that he knew of a place up on the lake that he had gotten a Mr. Dunn to get a price on from Mr. Brown for a friend of his living in Mississippi, but the price was so high that he did not write his friend in regard thereto, as he knew that he did not have enough money to finance it. The place was priced at $125 per acre. The witness (continuing his testimony) said:

"About that time I looked around, and Mr Razer was standing behind me, and he overheard the conversation, and he butted in and says, 'If you are talking about the Hill place,' he says, 'I have that place listed for sale myself,' and said Denis Brown wanted $125 an acre for it, and he had been offered $112 an acre for it. About that time Mr. Patrick said my mule was ready, and I got on my mule, and Mr. Countiss got on the horse. I rode as far as the Cox place with him, and on the way out there he said, 'I would like to go up in that country and look around; just ride over the country;' so I went home and got my car, came back by the Cox place, and picked Mr. Countiss up, and came into town, and on the way in he asked me who we could get to go up there with us. I told him I did not know Mr. Brown personally; had never seen him, or met him, that I knew of. He said that he would ask Mr. Dunn, or get him to go with us. When we drove up in front of the post office, Mr. Dunn was standing there, and he called him out to the car, and asked him to go up there with us to Mr. Brown's. We drove to Mr. Brown's Gossippia place. Mr. Dunn went in and called Mr. Brown out to the gate, and he introduced Mr. Brown to Mr. Countiss and myself. Mr. Countiss asked Mr. Brown what he wanted for the Hill place, and he told him he wanted $125 per acre. They had some little talk about the acreage. I have forgotten now what it was they said was in the place."

The witness further testified that at about the time they were leaving, Mr. Brown remarked to Mr. Countiss that he would like to sell him the Gossippia place (which included the Semple tract) also, just to clean up the two places, and went on to describe the acreage in the Gossippia place, and also in the Hill place, and he wanted $110 an acre for Gossippia and $125 an acre for the Hill place. Mr. Countiss stated the price was a little too high, and they got into the car and drove back to the town.

The next day Higgins and Countiss inspected the Hill place; the following day they inspected the Gossippia place, together with Mr. Brown. The day after that, following some negotiations with a Mr. Stein, a banker representing Brown, the price and terms of sale were agreed upon. On the next day the deed was executed.

Countiss, the vendee, denies that he made the purchase from Brown through any solicitation from Razer. He states that the purchase was made direct from Brown. His version of the incident at the livery stable is substantially the same as given by Higgins. He admits that Razer did say something about taking him up to see the place in his car, but says that he paid no attention to him; that he wanted to go with Mr. Higgins, whom he knew for a long time, and that if Mr. Razer was a real estate agent he did not want to take up his time.

Defendant admits that plaintiff telephoned him on the day Countiss, Higgins, and Dunn called on him at Gossippia. He states that in the conversation plaintiff merely advised him of the impending visit and warned him to be careful, as there was some crooked work going on; defendant's reply being that he thought he could take care of them. All the other matters and things testified to by plaintiff are specifically denied by defendant.

It is argued that the testimony of plaintiff, to the effect that he was employed by defend-

ant and was the procuring cause of the sale, is corroborated by the testimony of James A. Kirk, W. E. Goodwin, and W. E. Dunn.

It is true Kirk testified that defendant told him that plaintiff had the same contract as he had to sell the properties. Kirk, who was at the time a real estate broker in Lake Providence, appears to have had three contracts, all in writing, with defendant. The first, dated August 17, 1919, to sell the Gossippia plantation, and the second, dated August 19, 1919, to sell the Ingleside place. The third contract given some months later covered the Ingleside place only. This contract varied the terms of the previous contract given on the same property.

The alleged conversation with Kirk took place some months after the completion of the sale to Countiss, when defendant called on him in reference to some threats reputed to have been made against defendant by plaintiff.

Kirk pretends to be disinterested; nevertheless, he voluntarily advised defendant that he ought to pay the plaintiff for his services. He furnished plaintiff with the first two contracts given him by defendant, in order that he might use them in the trial of the case and appears to have been a willing witness. He made no reference to the third contract, until it was brought out on cross-examination. He states that he knew of the negotiations by Razer for the sale of the property to Countiss at the time the deal was being made, and that he made no effort to sell it, as he had not secured the purchaser. We are unable to reconcile this statement with the facts showing that the only connection had by plaintiff with the negotiations for the sale of the property was restricted to the few minutes at the livery stable when he "butted" into the conversation between Higgins and Countiss. The witness admits that he had numerous conversations with plaintiff after the deed was executed.

Defendant absolutely denies that he made the admissions attributed to him by Kirk.

The testimony of Messrs. Dunn and Goodwin is to the effect that on one occasion, while they were on the streets of Lake Providence engaged in conversation, defendant walked up and said something about selling his places. Mr. Dunn jokingly remarked to defendant that, "he liked to have got me a licking from Razer." The witness said that plaintiff was mad at him for going up there with Countiss and Higgins. Defendant is said to have then stated, "I don't know who I owe for helping me out on this; Dunn, Higgins, or Razer. To which Dunn replied that he did not owe him anything, but thought that plaintiff ought to give old man Razer something; that defendant nodded his head and said he was going to give him something. Defendant did not admit, however, that he legally owed plaintiff any amount whatever.

Defendant's recollection of the conversation is that they were talking about commissions and whether he owed them or not; Dunn admitting that defendant did not owe him anything, and that defendant stated:

"The people did not seem to be willing to concede that I knew my own business; and Mr. Dunn then says, 'You ought to give old man Razer 100 or 150, he did interest himself in the lake place to my knowledge. I says, 'from a point of view of equity, I wouldn't at all object, but, from a legal point of view, I don't owe him a cent.'"

[1] Defendant's willingness to pay something to plaintiff as an evidence of good feeling, and in recognition of the fact that he interested himself in the sale of the Ingleside place, cannot be considered as an admission of any obligation on his part. What was intended as a favor cannot be construed as an acknowledgment of a right. Junk v. Golden Ranch Sugar & Cattle Co., 122 La. 794, 48 South. 267.

Defendant also contends that his testimony

was corroborated by that of Hope T. Countiss, and by a letter written him by John M. Countiss.

Hope T. Countiss testified that John M. Countiss, on the day he came out to Waterloo plantation, told him that he had heard from Razer of the Brown property, and was going to make a trip to see it that afternoon. This is denied by John M. Countiss, who says that Hope Countiss is mistaken. We think this must be so, because John M. Countiss had never seen or heard of plaintiff before the incident at the livery stable. At that time he was in a hurry to get away and paid scant attention to Razer. We believe the confusion arose in the mind of Hope Countiss from the fact that he had, himself, previously gone out to see the Hill or Ingleside place with defendant, after he had mentioned to defendant that he was looking around, at the request of friends, for some small places for them.

"Oral admissions, or reports of conversations, are unreliable evidence at best." Powell v. Smith, 131 La. 243, 59 South. 198.

Much stress is laid upon a letter addressed to Razer by John M. Countiss, under date of May 31, 1920, in which he refers to the sale of the Brown property, and of his being approached by plaintiff at Wells Brothers' Stable, and concludes by saying plaintiff was the first man who mentioned the property to him, although he did not remember much of the conversation.

On November 21, 1919, when the matter was fresh in his memory, Mr. Countiss issued a statement in writing, in which he emphatically set forth that he bought the properties directly from Mr. Brown, without the aid or solicitation of any real estate agent whatsoever.

It is not shown why Mr. Countiss wrote the letter of November 21, 1919. Possibly he did so to rid himself of the importunities of defendant, who seems to be possessed of an aggressive disposition. But however that may be, when he took the stand as a witness in the case, he swore in positive terms that he bought the property from defendant, and without the intervention of any agent; that plaintiff did mention in a way about a piece of property containing something like 400 acres, but he did not state to whom the property belonged; that he was not paying any attention to plaintiff, as he desired to go with his friend Higgins; that he never had any further conversation with plaintiff, and that what plaintiff had mentioned to him in no way contributed to his purchase of the properties. Greater weight must be given to sworn, than to unsworn, statements.

Plaintiff's case does not recommend itself to the court. Our conclusion is, from a careful examination of the record, that plaintiff, in pursuance of his plan of engaging in "anything to make a dollar," seized the opportunity presented, when he accidentally overheard the conversation between Higgins and Countiss about lands, of building up a large claim for commissions against defendant. It was with this idea in view he "butted" into the conversation, and it was on the chance that something might eventuate to his advantage, from what he had heard, that he telephoned defendant of the possible visit by Higgins and Countiss. From the time of the accidental meeting in the livery stable to the actual institution of the suit his every effort seems to have been directed towards creating an impression in the community that he procured the sale from defendant to Countiss, and in building up his case by statements to various persons. His want of confidence in his own claim is shown by his attempt to influence the testimony of Higgins by the offer of a monetary consideration, and to coerce defendant by threats of personal violence.

[2] Plaintiff has not satisfied the requirement of the law that he must make his case

reasonably certain in order to be entitled to a recovery.

The judgment appealed from is set aside, and the suit is dismissed, at plaintiff's cost.

Rehearing refused by the WHOLE COURT.